## Parkhurst Estate (No. 2)

Before Klein, P. J., Bolger, Lefever, Saylor and Shoyer, JJ.

The facts appear from the following opinion of

KLEIN, P. J., November 10, 1959.—Wilbert P. Parkhurst died a resident of Puerto Rico, on June 28, 1958. When he died, Girard Trust Corn Exchange Bank, hereinafter referred to as Girard, held, in a safekeeping account in his name, various securities listed in the joint names of decedent and each of the five following persons: His son, Charles Parkhurst; his daughter, Elsie Parkhurst; his niece, Rae Fischer, and two employes, Cristina Rivera and Socorro Rivera.

Norman Parkhurst was appointed judicial administrator of decedent's estate in Puerto Rico. On February 25, 1958, a citation issued upon the judicial administrator's petition, directed to Girard and the five above designated persons, to show cause why decedent's checking account and the securities registered jointly in their names and the name of decedent in decedent's safekeeping account, should not be released to him. Preliminary objections were filed by Girard, challenging the jurisdiction of the orphans' court. In an opinion by Lefever, J., dated May 28, 1958, reported in 14 D. & C. 2d 661, the preliminary objections were sustained without prejudice to the right of any proper person to apply for ancillary letters of administration and to raise the questions raised in the petition at the audit of the ancillary administrator's account.

Ancillary letters of administration were issued by the Register of Wills of Philadelphia County to Seymour C. Wagner on July 21, 1958. On March 30, 1959, a citation issued on his petition, directed to Girard and to the aforementioned five persons, to show cause why the moneys contained in decedent's checking account and the jointly registered securities should not be released to the ancillary administrator.

An answer was filed by Girard, which, in effect, states that it is a stakeholder and will abide by the decision of the court, which it regards as necessary to protect it from double liability, because of the conflicting claims of the parties in interest.

Stipulations in lieu of answers were filed by Elsie Parkhurst, Cristina Rivera and Socorro Rivera agreeing that the cash and the jointly registered securities could be transmitted to the domiciliary administrator without prejudice to their rights to make such claims as might be appropriate at the domicile.

Responsive answers were filed by Charles W. Parkhurst and Rae Fischer, and replies were filed thereto. These matters came on for hearing before me on October 13, 1959.

Rae Fischer, decedent's niece, is a resident of Pennsylvania and receives no benefits from decedent's estate in Puerto Rico. In sustaining the preliminary objections filed in this case, Judge Lefever said, on page 667:

". . . Rae Fischer is entitled to have the question of her title to these certificates determined in Pennsylvania and not be required to undergo the expense and effort of following these certificates to Puerto Rico. . . ."

We are in full accord with this statement. In Noble Estate, 71 D. & C. 183 (1950), we said, at page 188:

"The law is clear that the orphans' court, when adjudicating the account of an ancillary administra-

tor, is not restricted to making awards to creditors only. It may, in its discretion, distribute the funds among the parties entitled to it or remit it to the forum of the domicil for that purpose: Bertin's Estate, 245 Pa. 256 (1914); Dent's Appeal, 22 Pa. 514, 520 (1854)."

Accordingly, we will pass upon Rae Fischer's claim to the securities and the dividends declared thereon in this opinion.

We will, however, refrain from passing upon the claim of decedent's son, Charles. He is a resident of Puerto Rico and is entitled to a share of his father's estate. It appears from statements of counsel that under the law of Puerto Rico all property received by a beneficiary from a decedent in his lifetime or placed in their joint names by decedent is treated as an advancement. Such property is regarded as part of decedent's estate and then deducted from the heir's share. I accordingly direct that the securities held jointly by decedent and his son, Charles, be transmitted to the domiciliary administrator without prejudice to Charles' right to make such claims thereto as he deems appropriate at the domicile in Puerto Rico.

The facts with respect to Rae Fischer's claim are not in dispute, having been agreed to in a stipulation of counsel which has been made part of the record.

Decedent opened a checking account in his own name in 1937 at Corn Exchange National Bank and Trust Company, hereinafter referred to as Corn Exchange, now, by merger, Girard Trust Corn Exchange Bank. On the date of decedent's death, $14,892.36 was on deposit in this account.

On or about September 15, 1941, decedent, with his own funds, purchased the following securities, and caused them to be registered in his name and that of his niece, Rae Fischer, "as joint tenants with the rights of survivorship and not as tenants in common":

50 shares General Motors Corporation, common stock, par $10, certificate no. W C 401-852; 10 shares E. I. du Pont de Nemours & Co., 4½ percent preferred, certificate no. J-66837; and 40 shares Commonwealth Edison Co., certificate no. 61655.

The certificates were forwarded by the bank to decedent on October 22, 1941. On October 6, 1942, decedent rented a safe deposit box at Corn Exchange. One week later, on October 13, 1942, he changed it into a jointly owned box in his name and that of Rae Fischer, "with either having full rights of entry therein without the presence of the other."

The safe deposit box was surrendered on September 4, 1947, and Rae Fischer delivered the above listed securities to the Corn Exchange "for account of W. P. Parkhurst—safe keeping."

The 40 shares of Commonwealth Edison Co. were sold by Corn Exchange on decedent's written order on November 20, 1950, for $1,073.47, and the 10 shares of du Pont preferred were sold on his written order on November 22, 1950, for $1,243.82.

On February 1, 1951, Corn Exchange purchased 50 shares United States Steel common and charged decedent's account with the cost. The certificate was registered in the joint names of decedent and Rae Fischer in the same manner as the stock which had been sold. The certificate was placed in decedent's safekeeping account. In 1955, this stock was split two-for-one and a new certificate issued, registered jointly in the same manner. This certificate was also delivered to Corn Exchange for safekeeping on behalf of decedent.

As a result of two stock splits of the General Motors stock, the first, a two-for-one split on October 30, 1950, and the second, a three-for-one split in 1955, three new certificates for 100 shares each were issued, each registered jointly in the names of decedent and Rae Fischer.

These certificates were also retained by the bank in decedent's safekeeping account.

All dividends issued on all of these shares in decedent's lifetime were deposited by the bank to the credit of the "W. P. Parkhurst" checking account.

- All of the stock certificates in question held in decedent's safekeeping account were accompanied by what were described in the stipulation as "printed forms of 'loose powers' or 'stock powers' or 'assignments separate from certificate,' all undated and all blank as to type of security, certificate number, name of transferee or assignee, and in all other respects also blank, except that each bore the signature of decedent and Mrs. Fischer."

The custodian department cards of Corn Exchange or Girard with respect to all of the securities mentioned in the preceding paragraph were titled in the name of W. P. Parkhurst and no other name appears on the account card as an owner or coöwner of the account and, as a matter of this bank's practice, none of the securities would have been delivered to anyone other than decedent except upon decedent's express authorization.

The auditing judge is of opinion that the present case is controlled by Martella Estate, 390 Pa. 255 (1957), and Grossman Estate, 386 Pa. 647 (1956).

In the Martella case certain stock certificates in the name of decedent and one of his sons "as joint tenants with right of survivorship and not as tenants in common" were found in a small metal box which decedent always kept in his possession in his house and to which he had access but the son did not. All of the stocks in question were purchased by decedent with his own money and all of the income from the stocks was kept by decedent and included in his income tax returns. In holding that no valid inter vivos gift had been proved, Mr. Justice Bell said, at page 258:

"In Grossman Estate, 386 Pa. 647, 126 A. 2d 468, the Court said (pages 649-650) : 'In Brightbill v. Boeshore, 385 Pa. 69, 122 A. 2d 38, the Court, quoting Tomayko v. Carson, 368 Pa. 379, 383, 83 A. 2d 907, said (page 74) : " 'A claim of a gift inter vivos against the estate of the dead must be supported by clear and convincing evidence: Leadenham's Estate, 289 Pa. 216, 137 A. 247; Snyderwine, Admrx. v. McGrath, 343 Pa. 245, 22 A. 2d 644.' "

" 'In the recent case of King Estate, 387 Pa. 119, 126 A. 2d 463, . . . the Court said (page 122) : "To constitute a valid gift inter vivos . . ., two essential elements are requisite: An intention to make an immediate gift and such an actual or constructive delivery to the donee (a) as to divest the donor of all dominion and control, or (b) if a joint tenancy is created, as to invest in the donee so much dominion and control of the subject matter of the gift as is consonant with a joint ownership or interest therein." ' " See also Balfour v. Seitz, 392 Pa. 300 (1958) ; Elliott Estate, 378 Pa. 495 (1954).

It seems evident that Rae Fischer has failed to meet the burden which is placed upon her to establish that decedent made a completed inter vivos gift of the stock in dispute to her.

In the opinion of the hearing judge decedent did not intend to make an immediate gift of the jointly registered securities to claimant; evidently they were not to become her property until he died. Decedent retained sole and complete control and dominion over them during his lifetime. He could do with them as he willed without interference from his niece. Although the securities were registered in their joint names, they were in decedent's sole possession at the time of his death. There was no delivery to claimant which vested in her the degree of control over the securities that is consistent with joint ownership or interest in the

securities, and the execution and delivery by her to decedent of the blank stock powers permitted him to deal with the stock as if he were the sole owner.

Counsel for Rae Fischer appears to place great reliance upon the fact that for a period of five years from October 13, 1942, until September 4, 1947, the original securities, registered in their joint names, were kept in a safe deposit box to which each had full access. In our opinion this fact is of little consequence under the circumstances of this case.

In Grossman Estate, supra, a stock certificate, made out in the name of decedent or his sister, was found in his safe deposit box after his death. A printed power of attorney, signed by claimant, was attached to the certificate, authorizing decedent to pledge the certificate as collateral security for any loan. It also appeared that claimant had a right of access to the box. The court held that these facts were not sufficient to constitute clear and convincing evidence of a valid inter vivos gift of a joint interest in the stock certificate with right of survivorship. The court said, at page 650:

"Assuming Theodore Grossman had a donative intent, claimant failed to prove an actual or constructive delivery of the stock of Hudson's, Inc., by clear and convincing evidence. Claimant, we repeat, never had possession of the stock certificate; the stock certificate was always kept in the safe deposit box of decedent. *A right of access* to the safe deposit box which contained these shares, as well as *many other shares of* stock of the decedent, does not amount to or prove delivery or a completed gift to claimant. Even a joint lease of a safe deposit box, without more, is not of itself sufficient to establish joint ownership of securities found therein which originally belonged to one of the lessees: Tomayko v. Carson, 368 Pa. supra; Wohleber's Estate, 320 Pa. 83, 181 A. 479; Cf. also King Estate,

387 Pa., supra [387 Pa. 119]; Isherwood v. Springs-First National Bank, 365 Pa. 225, 74 A. 2d 89."

In the instant case, Rae Fischer surrendered any right she may have had in 1947, when she removed the securities from the joint safe deposit box and returned them to decedent's sole and exclusive control. She did not at any time include any of the securities as her property in her Pennsylvania personal property returns. Her entire course of conduct negatives' her present claim and clearly demonstrates that she did not regard herself as a coöwner of the securities but merely as her uncle's agent to facilitate his dealings with them.

We are confirmed in our conclusion by the significant fact that the specific securities Rae Fischer is now claiming were never in the safe deposit box. The United States Steel stock was purchased in 1951, about four years after the box was surrendered, and the certificate for 50 shares of the General Motors stock originally in the box was returned and replaced by three new certificates for 100 shares each.

The hearing judge therefore rules that Wilbert P. Parkhurst, decedent, did not make a valid gift inter vivos of the securities registered in his name jointly with his niece, Rae Fischer, and that consequently she had no right or title thereto.

Rae Fischer's claim with respect to the dividends received prior to decedent's death is also without merit. Decedent acted, and was consistently treated, as the sole owner of these dividends during his lifetime. They were all credited at his express direction to his sole account and he included all of them in his Federal income tax returns. Decedent's appropriation of these dividends was never challenged or questioned by claimant. She never received or claimed any of the dividends in her uncle's lifetime and there is nothing in this record to suggest that she expected, or that her uncle

intended her, to have any right to or interest in them while he was living. This is fully supported by her admission that she never included any of the dividends in her income tax returns.

The claim with respect to the dividends declared on the securities since decedent's death is equally without merit. Having concluded that Rae Fischer has no right or title to the securities themselves, it follows without question that she has no right of any kind to these dividends.

Accordingly the claims of Rae Fischer to the securities registered jointly in the names of decedent and herself, as well as to all dividends declared in his lifetime or since his death, are dismissed. . . .

*Joseph N. Dubarry, 4th,* of *Montgomery, McCracken, Walker & Rhoads,* for exceptants.

*Alan Reeve Hunt* and *William White, Jr.,* of *Duane, Morris & Heckscher,* contra.

BOLGER, J., June 3, 1960.—As recited in the opinion of the hearing judge, decedent, a resident of Puerto Rico, maintained a safekeeping account at the Girard Trust Corn Exchange Bank, and at the time of his death certain securities were found in this account registered severally but similarly in the joint names of decedent and of five other persons. The hearing judge passed upon the merits of only one of these claims, viz., that of Rae Fischer, decedent's niece. Of the four others, upon whose claims the hearing judge did not take jurisdiction but reserved to all of them the right to present their claims against decedent's estate at his domicile, Puerto Rico, only one, decedent's son, Charles, has filed exceptions. The niece, Rae Fischer, also filed exceptions, which are the main subject of this opinion.

Since our jurisdiction over the claim of the son, Charles, was discretionary with the hearing judge and the record does not reveal that the refusal to assume jurisdiction was capricious or arbitrary, we find the

exceptions of Charles are without merit: Noble Estate, 71 D. & C. 183 (1950) ; Bertin's Estate, 245 Pa. 256.

Claimant, Rae Fischer, not only claims the securities registered in the names of decedent and of herself, but also the dividends upon them which were paid to decedent in his lifetime. Her exceptions are based upon the conclusion of the hearing judge that decedent did not intend to make an inter vivos gift to her and that there had not been proper delivery. All of the relevant facts are contained in the opinion and do not require repetition. The securities in question were found in an exclusive safekeeping account of decedent at Girard and registered in the names of decedent and of claimant as joint tenants with right of survivorship and not as tenants in common, along with blank powers of attorney signed by both decedent and claimant. The instruments were admittedly not testamentary and, therefore, claimant to prevail must establish an inter vivos gift from decedent: Elliott Estate, 378 Pa. 495 (1954). The tentative trust doctrine does not apply: Chadrow v. Kellman, 378 Pa. 237, 244. The award to the domiciliary administrator of decedent's intestate estate naturally follows the hearing judge's conclusion that there was no immediate gift.

Claimant bears the burden of establishing the gift by a clear and convincing proof that decedent: (1) Intended to make an immediate gift; and (2) such an actual or constructive delivery to her (a) as to divest decedent of all dominion and control, or (b) if a joint tenancy were created, as to invest in claimant so much dominion and control of the subject matter of the gift as is consonant with a joint ownership or interest therein: Amour Estate, 397 Pa. 262 (1959) ; Martella Estate, 390 Pa. 255; Grossman Estate, 386 Pa. 647; Balfour v. Seitz, 392 Pa. 300; Elliott Estate, supra, and King Estate, 387 Pa. 119.

The history of the case covers the period from September 15, 1941, when the first stock purchase took place, until the date of decedent's death, June 28, 1956. The intervening years involved a series of events from which we must derive the necessary conclusions as to intent and delivery or the lack of either or both of them. The case differs from most of the cited ones because of the number of incidents involved. The facts, however, approximate those in Elliott Estate, supra.

Claimant does not rely upon a contract between the parties or with the bank as in Amour Estate, supra, King Estate, supra, or in the cases cited in the footnote appearing in King Estate, supra, page 123, viz., Furjanick Estate, 375 Pa. 484; Lochinger v. Hanlon, 348 Pa. 29; Fuller v. Fuller, 372 Pa. 239; Culhane's Estate, 334 Pa. 124; Mader v. Stemler, 319 Pa. 374, and Mardis v. Steen, 293 Pa. 13. In all of these cases, except Culhane's Estate, claimant was wife or child of the alleged donor. Nor does she assert that a contract existed between decedent and the issuer of the securities: Horstman Estate, 398 Pa. 506. Neither is there any direct evidence of an express, unequivocal or unambiguous gift as in Brightbill v. Boeshore, 385 Pa. 69, and in Chapple's Estate, 332 Pa. 168. Therefore, there is not involved an attempt by the domiciliary administrator to void an established prima facie gift, which circumstance, under the last two cited cases, would shift the burden of proof to the domiciliary administrator to overcome the prima facie case by proof that is clear, precise and indubitable.

In the absence of contract or of an established prima facie gift, we cannot extract from the history of the several transactions and rely upon isolated acts or declarations for or against either party, such as the facts which existed at the date of death, to wit, the possession and registration of the securities with the accompanying blank powers executed by both parties

which would require without more evidence an award
to the administrators (Elliott Estate, supra), or that
claimant had received delivery of the securities because
she possessed them for a brief time when she removed
them from the safe deposit box on September 4, 1947,
and immediately placed them in decedent's safekeeping
account with Girard, or ruling that the safe deposit
box being in joint names was insufficient to sustain
claimant's burden of proof: Isherwood v. Springs-First
National Bank, 365 Pa. 225; Tomayko v. Carson, 368
Pa. 379.

Many of the acts and declarations of decedent and
claimant are equivocal and ambiguous. Certainly no
single act can be said to be so complete in itself as to
be unrelated to other actions or declarations. Therefore
evidence of all transactions is admissible and there is
no basis for excluding from the record any evidence
of transactions between the date of the opening of the
box and the date of decedent's death. In Grossman
Estate, supra, pages 651-652, Justice Bell said:

". . . where an intention to make a gift is not
clearly manifested or the evidence of delivery is not
clear, or the acts or declarations of decedent are equiv-
ocal, or ambiguous or incomplete, parol evidence is
admissible to prove (a) an intention or lack of inten-
tion to make a gift, and (b) delivery or failure of
delivery." It is only from a careful review of the entire
course of conduct of the parties and of their agents
that correct findings of fact and conclusions of law
can be made.

Our review of these facts sustains all of the findings
and conclusions of the hearing judge. The first salient
factor is that claimant is not the wife or child of
decedent and therefore her burden of proof is not
lessened as it was in King Estate, supra; Brightbill v.
Boeshore, supra, and Chapple's Estate, supra. Among
the other facts are that all the securities were pur-

chased with decedent's own funds, that the proceeds of sales when made were deposited in his individual bank account, that he alone gave all instructions for purchase and sale of securities, for their registration and for their custody, legal possession of the securities was at all times in decedent during his life and he received all dividends, that he at all times acted in a proprietary manner and treated claimant as a messenger or agent and that he intended that her only interest in the securities was her right of survivorship.

Quoting from paragraph 43 of the stipulation of facts: "Correspondence from decedent to Girard shows that it was the belief and intent of decedent that shares of stock, the certificates for which were registered in his name jointly with another as joint tenants with the right of survivorship and not as tenants in common would be the sole property of and subject to the sole control of the other joint owner in the event of the death of the decedent, but not prior thereto." Among the statements so made by decedent in letters to Girard was one under date of September 2, 1955, in which he stated: "In answer to my request that all dividends for stock held in my name or in joint names be placed at my personal account, for which I have sent you powers of attorney to give me full control of the joint held stock. . . ." Similarly, on October 6, 1955, in a letter to the General Motors Corporation, after referring to 540 shares of General Motors Common Stock, apparently held in his own name, he said: "In addition, held jointly in the names of Wilbert P. Parkhurst and Elsie Parkhurst 41 shares. Also held jointly in the names of Wilbert P. Parkhurst and Socorro Rivera 162 shares. I have a power of attorney for the shares held jointly, therefore my holdings are 843 shares. The stock certificates are held by the Girard Trust Corn Exchange Bank, Broad and Chestnut Streets, Philadelphia, Pa. for safekeeping. All dividends are to be

paid to the Girard Trust Corn Exchange Bank for the account of W. P. Parkhurst." While these statements are not essential to the determination of the case, they are pertinent and relevant because they are part of the res gestae. They all tend to negative any intention to make a gift or that anyone other than himself had anything but a possible testamentary interest in the stock.

It is equally important that we turn to a review of the actions of claimant during this time. She always acted with alacrity and without protest in following every one of decedent's instructions. Her visits to the safe deposit box were not on her own behalf, but only on behalf of decedent. She never had legal possession in the nature of dominion or control of her own over the certificates, but acted merely as temporary custodian when she obtained them from the box on September 4, 1947, and placed them in decedent's safekeeping account with Girard and received from Girard a receipt therefor. If she had regarded herself as donee at this point, she would have retained possession of the securities as did the donee in Brightbill v. Boeshore, supra, and Chapple's Estate, supra. The very most that claimant can derive from this temporary custody of the securities is that the nature of her holding them is unclear, equivocal and ambiguous. The conclusion of the hearing judge that claimant was merely decedent's agent and not his donee is supported by her conduct. She signed transfers immediately upon request and without protest; she failed to demand dividends or custody of the securities at any time; she executed the blank powers found with the securities after decedent's death, all of these facts not only point to her not ever having so much dominion and control of them as is consonant with a joint ownership or interest therein, but to the fact that she must have understood at all times that decedent did not intend

to make an immediate gift of any interest in the securities to her, but that she should own them at his death. For these reasons and under the authorities cited by the hearing judge and those stated above, we sustain the hearing judge's conclusion that claimant has not successfully fulfilled her obligation of proving her case by clear and convincing testimony.

The intentions and actions of decedent certainly rise no higher than did those of decedent in Elliott Estate, supra, wherein Justice Allen Stearne stated, page 500: "Our reading of the testimony coincides with the excellent summary of President Judge Gross when he said that decedent 'wanted to give away his money and keep it at the same time.' Obviously decedent did not intend the alleged donees to receive these funds until after his decease." From the facts of the instant case, it does not even appear that decedent acted as an "Indian giver", for he never invested in claimant so much dominion and control of the stocks as was consonant with a joint ownership or interest therein. It necessarily follows that since there was no gift to claimant, the dividends paid to decedent were his property and claimant had no right to them.

The majority and the minority opinions part company initially because of the minority opinion's approach. Therein the burden of proof is placed upon the domiciliary administrator, whereas the majority holds that it rests upon claimant. The controlling point of difference is that the minority rejects the basic conclusion of the majority and of the hearing judge that decedent at all times acted as principal throughout the history of the case, while claimant acted at all times as the agent of decedent and not as the recipient of a gift. This point distinguishes this case from all of the cited precedents. Again the minority opinion seeks to distinguish this case from Martella Estate, supra; Grossman Estate, supra, and Elliott Estate, supra, on

the ground that those cases do not involve a joint tenancy. Both the Martella and Elliott cases definitely involve joint tenancies while in Grossman Estate, supra, the name of the owner or registered holder was "Hilda S. Grossman or Theodore M. Grossman."

The magnitude of the current trend of purchasers of securities having them registered in the form appearing in this case has apparently raised in Judge Lefever's mind the question of whether all of the elements of joint tenancy have been sufficiently weighed in this case as well as in the cited cases. One answer to this query is in the express provision in the principle of law pertaining to this type of registration requiring only a qualified delivery. Another answer is that no matter what result would flow from such an analysis here, the applicable principle requires *in all cases* that there be (1) intention to make the gift, and (2) some form of delivery, neither of which has been proved by clear and convincing testimony in this case.

Next, the minority opinion gratuitously deduces from paragraph 43 of the stipulation of facts that decedent intended to make an immediate gift. Not only do we read this paragraph differently as hereinbefore recited, but counsel at the reargument, which was heard principally because of such possible implication, maintained that no such deduction was intended. *There was no agreement between counsel or the parties that decedent intended to make an immediate gift.* Finally, taking off from this false premise, the minority grabs at several straws from the whole bale of facts to jump to conclusions based largely upon supposititious facts, facts not to be found in the record. As hereinbefore stated, the essential elements of a gift must be determined from a review of the entire record.

The exceptions are dismissed and the decree is confirmed absolutely.

LEFEVER, J., *dissenting* in part and *concurring* in part, June 3, 1960.—I fully agree with the learned hearing judge's refusal to decide Charles Parkhurst's claim upon the merits, and the decision of this court to dismiss his exceptions.

I disagree, however, with their decision that the stock certificates, registered in the names of decedent and claimant-exceptant Rae Fischer "as joint tenants with right of survivorship and not as tenants in common" belong to decedent's estate. In my view, they are the property of claimant and should be awarded to her. Hence, this opinion.

The crucial question is whether decedent made a valid gift inter vivos to Rae Fischer of *a joint tenancy* with right of survivorship in the disputed shares of stock. I agree with the majority that: "Claimant bears the burden of establishing the gift by a clear and convincing proof that decedent: (1) Intended to make an immediate gift; and (2) such an actual or constructive delivery to her (a) as to divest decedent of all dominion and control, or (b) if a joint tenancy were created, as to invest in claimant *so much dominion and control of the subject matter of the gift as is consonant with a joint ownership or interest therein* [citing cases]": Majority opinion page 771. (Italics supplied.) In the interpretation of the facts we part company, because in my opinion claimant has so proved such a gift.

The majority indicates that the first requisite is not present in this case. However, in my opinion the parties concede its presence. This appears in paragraph 43 of the "Stipulation of Counsel re Facts . . ." viz.,: "Correspondence from decedent to Girard shows that it was the belief and *intent of decedent* that shares of stock, the certificates for which were registered in his name jointly with another as joint tenants with the right of survivorship and not as tenants in common would be the *sole property* of and subject to the *sole*

*control* of the other joint owner in the event of the death of decedent, but not prior thereto" (Italics supplied).

Consequently, decedent wanted claimant to be sole owner of the disputed stock at his death. He could accomplish this by will, by creation of a trust, by gift mortis causa or by immediate gift of a joint tenancy with right of survivorship. He did not do this by will, trust or gift mortis causa. But he did register the securities *on the books of the corporation* and have issued securities in their joint names. The essence of title as "joint tenants with right of survivorship and not as tenants in common" is to vest in two or more persons joint ownership during lifetime, with sole ownership and control passing to the survivor at the moment of the death of the other joint tenant(s). Therefore it *follows* that decedent *intended* to make a gift of the shares of stock to Rae Fischer as a joint tenant with right of survivorship. Any other interpretation of decedent's conduct makes his acts a futility, a useless formality. Moreover, these securities remained in their joint names for 15 years. Decedent made no complaint, no request of claimant to return sole ownership to him, no charge of fraud, no litigation to obtain their return. Clearly, he intended an immediate gift inter vivos of a joint tenancy. Accordingly, the first requisite for a gift inter vivos is present.

This case therefore hinges upon the question: Was the second element present, i.e., was there a *delivery*, actual or constructive of *so much dominion and control as is consonant with joint ownership?*

The stipulation of counsel sets forth, inter alia, the following admitted facts:

"4. On or about September 15, 1941 the *decedent, with his own funds, caused to be purchased by Corn Exchange . . . and registered in the name of 'Wilbert P. Parkhurst and Rae Fischer . . . as joint tenants*

*with right of survivorship and not as tenants in common'*,

"50 shares General Motors Corporation common stock, par $10., represented by Certificate No. WC 401-852;

"10 shares E. I. du Pont de Nemours & Co., 4½ percent Preferred, represented by certificate No. J 66837;

"40 shares Commonwealth Edison Co., represented by certificate No. NO 61655."

"6. On October 6, 1942, the decedent rented safe deposit box No. 115, Section 3, at Corn Exchange. On October 13, 1942, he changed it into *a jointly-owned box rented in the names of decedent and Mrs. Fischer, with either having full rights of entry therein without the presence of the other*. Mrs. Fischer's signature appears on the rental agreement, having been received at the Bank October 13, 1942.

"7. This safe-deposit box was entered on only three occasions, namely, October 6, 1942 by decedent alone; July 20, 1944 *by Mrs. Fischer alone*; September 4, 1947 *by Mrs. Fischer alone*.

"8. This safe-deposit box was surrendered September 4, 1947, the date of the last access by Mrs. Fischer.

"9. On September 4, 1947, *Mrs. Fischer delivered to Corn Exchange possession of the certificates referred to in paragraph 4* above for 10 shares of du Pont Preferred, 50 shares of General Motors par $10. common and 40 shares of Commonwealth Edison. . . ." (Italics supplied.)

These admitted facts demonstrate that decedent, without any conditions or limitations, performed the necessary acts to register the stocks on the books of the company in the names of himself and Mrs. Fischer, as joint tenants with right of survivorship, and to have stock certificates issued bearing this registration. It would seem that these acts alone constituted constructive delivery; they placed the certificates beyond de-

cedent's exclusive, sole control. It was so held in Roberts' Appeal, 85 Pa. 84, the court stating, at page 86:

" 'But here the gift is complete by the delivery of the thing itself, for transferring the shares to her upon the books of the company is putting her in complete possession of the thing assigned, and clothing her with the complete legal title. It stands in the place of a delivery. Such an act performs precisely the office which an actual delivery would perform if it were a chattel. It is as complete  a delivery as the nature of the thing will admit of. There can be no clearer evidence of a design to part with the right of property in favor of another than an absolute transfer of the legal title to her for her own use. Retaining in his possession the certificates which are in her name, and which he could not use without her consent, cannot undo or qualify the decisive ownership with which he had invested her by the actual transfer to her on the books of the company. The best evidence of her ownership is the transfer on the books of the company. The certificates were but secondary evidence of her ownership, and only useful for purposes of transfer. They were nothing more than the official declaration by the company of what already appeared on their books. There was here no *locus poenitentiae*. He could not have used the certificates, nor could anyone have used them except Miss Foster.' "

The foregoing was quoted with approval as late as 1954 in Fey Estate, 2 D. & C. 2d 279, 287. Similarly, other unequivocal acts by donor without the knowledge of donee until after donor's death have been held to constitute delivery: Henderson v. Hughes, 320 Pa. 124 (executing and recording assignment of mortgage); Rynier Estate, 347 Pa. 471 (delivery of demand notes of donor, payable at his death, to third person for delivery to donee *after* donor's death). However, Mr.

Justice Bell has indicated in Martella Estate, 390 Pa. 255, 261, that more than this is needed, and to that extent Roberts' Appeal is impliedly overruled.

Those additional requisite facts are present in the instant case. For example, decedent made Mrs. Fischer joint owner of safe deposit box 115 in the Corn Exchange National Bank and Trust Company, with right in her of access thereto *alone*. Moreover, Mrs. Fischer and decedent each signed "the rental agreement" with the bank. Furthermore, Mrs. Fischer had a separate key, which she used when she twice exercised her right of entry into the box, *alone*. Decedent did not enter the box after Mrs. Fischer became joint owner thereof. Finally, Mrs. Fischer exercised her right to the box to the maximum extent of surrendering it for herself and decedent. Moreover, the certificates registered in the names of Mrs. Fischer and decedent "as joint tenants with right of survivorship" remained in this safe deposit box for five years. And Mrs. Fischer withdrew them from the box, *alone*. She had them in *her sole possession*. Her possession was proper, valid, authorized and unconditional. This was certainly "so much dominion and control as is consonant with joint ownership or interest therein".

In King Estate, 387 Pa. 119, the Supreme Court in upholding a gift inter vivos of stock certificates registered in the joint name of decedent and his wife as tenants by the entireties, laid great stress upon: (1) The fact that the securities were placed in a safe deposit box under a safe deposit box contract, which stated that all property in the "box is the joint property of both Lessees and, upon the death of either, passes to the survivor"; and (2) the fact that both decedent and his wife *had separate keys to the box.* The record in the instant case does not set forth the terms of the contract with the bank respecting the safe deposit box. However, Mrs. Fischer had a separate key,

had the right of sole access to the box and exercised that right.

We might well ask the question: "As Mrs. Fischer left the safe deposit box with the stock certificates in her possession, what further act could decedent have performed to have more completely and actually delivered to Mrs. Fischer 'so much dominion and control as is consonant with joint ownership or interest therein' "? It might be answered that decedent could have physically handed the stock certificates to Mrs. Fischer. However, his conduct in this case was just as definitive and conclusive as though he had done this. If A and B jointly lease an apartment and jointly own a bureau in that apartment and A says to B, "I give you my gold watch which is in the top drawer of our bureau, go get it", and B then goes and gets the watch, the constructive delivery is just as effective as though A had gone to the bureau, taken out the watch and physically handed it to B. What occurred here is even stronger. The stock certificates, registered in Mrs. Fischer's name as a joint tenant, were placed in their jointly owned safe deposit box by decedent or at his orders. He authorized Mrs. Fischer to remove the certificates. She did so. Delivery was complete. The majority states that she acted solely as decedent's agent or "temporary custodian when she obtained them from the box." But there is no evidence to that effect. It is a deduction which is not warranted by the other admitted facts.

We must ever bear in mind that the gift, in this case, was only of a joint tenancy. It was not a gift of the whole interest in the securities. Therefore, (b) of the above quoted requisite is apposite, viz., "such an actual or constructive delivery to her . . . if a joint tenancy were created, as to invest in claimant so much dominion and control of the subject matter of the gift as is consonant with a joint ownership or interest therein." The majority overlooks this and implies that she was

required to have "complete and uncontrolled possession of the securities". Necessarily, decedent, after the gift was made, still retained important and equal rights in the securities, rights shared jointly with Mrs. Fischer. Moreover, as soon as the gift of the joint tenancy became complete, possession thereafter of the certificates of stock was of no consequence or significance. It could not be otherwise. Each joint owner had an equal right to possession. Both could not exercise this right at the same time, especially as they lived in different cities. The joint owners had the right to agree between themselves who was to retain possession, namely, either of the joint tenants, or a custodian for one or both of them. They selected the Girard Trust Corn Exchange Bank as custodian for decedent, and Mrs. Fischer delivered the certificates to the bank for such purpose.

It follows from the foregoing that the second requisite element, delivery, was present at the latest on September 4, 1947, when Mrs. Fischer had physical possession of the securities, and probably on October 13, 1942, when she was given sole access and a separate key to the box wherein the jointly registered certificates lay. Hence, there was a valid, completed gift at that time.

The facts recited above are vitally different from those in recent Supreme Court decisions relied upon by the majority, namely: Martella Estate, 390 Pa. 255; Grossman Estate, 386 Pa. 647; and Elliott Estate, 378 Pa. 495.

The facts as stated by the Supreme Court in Martella Estate, supra, page 257, were:

". . . the stocks here in controversy which were made out at decedent's oral directions (to his broker) in the name of 'Samuel Martella and [his son] William S. Martella as joint tenants with right of survivorship and not as tenants in common'. . . . had been purchased by decedent with his own money and were kept

together with the decedent's other securities in a small metal box *which decedent always had* in his *possession* and *to which he alone had access,* with the exception that several months before his death he gave a key to the box to his daughter Natalie.

"*Claimant never had actual possession of the stocks in controversy, or control of or access to the box* in which decedent kept them . . . Decedent could not read or write English, but could sign his name.

"Decedent made several statements to Natalie, two of which are pertinent. Several months before his death, Mr. Martella said to Natalie: '. . . you hold this key, it belongs to the box where the money and all the securities are and after I go, it will be shared to all of you, because I am leaving it to everybody what I have.' About two months before his death, he said to Natalie: 'Every one of his children and it didn't make any difference whether they was boys or girls, each would get everything alike'." (Italics supplied).

The crucial differences between the cited case and the instant case are: (1) In Martella Estate claimant never had possession of the stock certificates during decedent's lifetime, whereas Mrs. Fischer had actual physical possession of the disputed certificates; (2) in Martella Estate decedent had sole possession of the small metal box which held the stock certificates and claimant never had possession of or access to this box, whereas Mrs. Fischer had joint ownership of the safe deposit box and twice entered it alone; and (3) in Martella Estate decedent did not intend his son to have the sole right to the disputed stock after his death, but reiterated "it will be shared to all of you, because I am leaving it to everybody what I have", whereas decedent concededly intended Mrs. Fischer to have sole ownership and control of the disputed stock after his death. In short, there was *no delivery* of any kind, actual or constructive, in Martella Estate.

The facts, as stated by the Supreme Court in Grossman Estate, supra, at page 648, are:

"In the space left for the owner or registered holder, [in the disputed stock certificate] appeared in typewriting 'Theodore M. Grossman'. Immediately above his name, in entirely different style of typing, appeared the words 'Hilda S. Grossman or'. The stock . . . was registered in the name of Theodore M. Grossman, and there was *no evidence when or by whom the words 'Hilda S. Grossman or' were typewritten on the certificate.* The safe deposit box was leased by decedent in his name on February 5, 1945, at which time he also executed a writing authorizing the bank to permit his sister, Hilda, *as his deputy, to have access* to such box . . .

"There was no evidence to prove that decedent had ever actually delivered the stock certificate to Hilda Grossman *or that Hilda ever had actual possession* of the stock certificate . . .

"Nathan Grossman, a brother of claimant, testified that decedent said to him sometime in May, 1948: " 'I gave Hilda my stock in Hudson's Jewelry Store . . . because it was to be financial support for her and his mother" '.

". . . he was legally bound, unless relieved by Jacobs and Yorkin, to offer it [the stock] first to the corporation . . ." (Italics supplied).

The controlling facts in the cited case were not present in the instant case, namely, the stocks were registered on the corporate books in the name of decedent *only* and there was no reference thereon to Hilda, someone other than decedent may have fraudulently inserted the typewriting "Hilda S. Grossman or" in the disputed stock certificate, the legend on the stock certificate was "Hilda S. Grossman *or* Theodore M. Grossman" and not a joint tenancy, there was a restriction on the sale and transfer of the stock with

the right in other persons connected with the corporation to have the first privilege of acquiring the stock from decedent, the right of claimant was limited and conditional, namely, "to be financial support for her and his mother" and finally, claimant had only a right of "access" to the safe deposit box and never had possession of the stock certificate. It is noteworthy that the Supreme Court in Grossman Estate, supra, at page 653, differentiates Brightbill v. Boeshore, 385 Pa. 69, on the last named fact, viz.: "That case is clearly distinguishable because of the proof that decedent actually delivered the stock certificate to his daughter who for many months retained possession thereof". The instant case is equally distinguishable because Mrs. Fischer had actual possession of the stock certificates.

Elliott Estate, supra, involved certificates of deposit issued by various banks in the names of decedent and a brother or sister "as joint tenants with right of survivorship and not as tenants in common". These certificates were found in decedent's safe deposit box after his decease. There was no joint rental, no deputy access, no possession of the certificates at any time by the survivor and no evidence that the survivor had knowledge during decedent's lifetime of the existence of the certificates or the appearance of his name thereon.

In contrast, in Amour Estate, 397 Pa. 262, a savings account was opened in the names of decedent and an unrelated friend, the money deposited was decedent's, both signed the signature card. Evidence was offered to show that it was opened "for the convenience of Miss Amour, with any balance at her death to go to her estate". Nonetheless, the court held that a valid joint account was established.

Analysis of the cited cases indicates that registering certificates of stock in joint names with right of survivorship, *alone*, is not enough. However, any addi-

tional fact is significant. Hence, the physical possession of the certificates by Mrs. Fischer, her actual exercise of her right to separate access of the joint safe deposit box and her surrender of the box are critical facts. Moreover, her signature on the safe deposit card is not unlike the signature on joint savings or checking account cards, which Mr. Justice Bell states in the footnote of Martella Estate, supra, page 259, is the difference that makes the gift valid in such cases. Moreover, in the cited cases decedent had no clear, unequivocal intention to make a gift. This is the key to those cases. In contrast, the intent in the instant case is clear. Hence, the requisite "clear and convincing evidence" is here present. It is patent that if decedent had died immediately after Mrs. Fischer took the stock certificates out of the box on September 4, 1947, she would have had undoubted sole ownership thereof as surviving joint tenant. Hence, the gift from decedent to Mrs. Fischer is established.

The majority holds that this is not enough; we must examine the later acts of the parties. However, " 'A gift inter vivos of stock, when once made, cannot be revoked or recalled by the donor without the consent of the donee, nor can the subsequent acts of the donor, to which the donee is not a party and to which he does not consent, affect his title, though, of course, the donee may return the stock, thus releasing any right of ownership . . .' ": Brightbill v. Boeshore, 385 Pa. 69, 78.

It follows, therefore, that the conduct of decedent and Mrs. Fischer after the date upon which she had the stock certificates in her sole possession cannot detract from the effectuation of the gift as above set forth or recall the gift without Mrs. Fischer's consent. Moreover, ". . . the reservation by the donor of the right to receive dividends, . . . are insufficient, without more, to negate a valid gift, provided all of the essential elements of a valid inter vivos gift have been

proved: Chapple's Estate, 332 Pa. 168 [and other cases]": Brightbill v. Boeshore, supra, at page 75. Therefore, the fact that dividends from the jointly owned stock were deposited by the Girard Trust Corn Exchange Bank in decedent's individual account did not negative the gift of the joint interest in these securities by decedent to Mrs. Fischer.

It follows that Mrs. Fischer is the surviving joint owner of the stock certificates, unless her conduct subsequent to September 4, 1947, constituted a valid return gift inter vivos thereof to decedent. But, there is no evidence in the record of an *intention* by Mrs. Fischer to give back to decedent her joint tenancy in the stock securities originally given to her, namely, 50 shares of General Motors Corporation, 10 shares of E. I. du Pont de Nemours & Company and 40 shares of Commonwealth Edison. Moreover, there was no intention by decedent to receive a gift back. Per contra, the parties have stipulated that decedent intended that Mrs. Fischer was to have sole ownership at his death; this is inconsistent with his receiving a return gift. Therefore, the first requisite of a return gift inter vivos, namely, intention, is absent.

Admittedly, the subsequent conduct of Mrs. Fischer in certain respects was equivocal and had elements of constructive delivery. Thus, she handed the stock certificates to the Corn Exchange Bank, taking a receipt "For account of W. P. Parkhurst—in Safekeeping". She apparently made no demand for a share in the dividends and they were deposited in decedent's individual checking account, although there is no "record of any written dividend order or other written instruction signed by Mrs. Fischer directing or authorizing the crediting of any dividend checks to the account of decedent alone . . .": Paragraph 34 of stipulation of counsel re facts. Moreover, she and decedent executed undated "loose stock powers", which at decedent's

death were attached to the certificates of stock, and gave the bank power to sell the stock. However, there is *no evidence* that she signed these stock powers *without any conditions attached.*

Per contra, the powers "covering the additional 50 shares of U. S. Steel and the final 200 shares of General Motors Common . . . had been requested from Mrs. Fischer on or after April 1956, shortly before decedent's death, and submitted to Girard following receipt of a letter to her dated April 16, 1956, signed 'Uncle Wilbert' saying that they were for the purpose of enabling these certificates to be registered in joint names with her instead of in decedent's name only": Paragraph 39 of stipulation of counsel re facts. Moreover, she signed the powers to the original stock with *the express oral understanding* that decedent would, at a feasible time, sell the stocks and reinvest the proceeds thereof in other securities, to be *registered in the names of decedent and Mrs. Fischer as joint tenants* with right of survivorship. Eventually the stocks were sold and the net proceeds were invested in 50 shares of United States Steel Company common and *registered in the joint names of decedent and Mrs. Fischer.*

None of these acts of Mrs. Fischer were the irrevocable, unequivocal acts which constitute delivery. Moreover, there was no intention. It follows that there was no gift inter vivos from Mrs. Fischer back to decedent. Furthermore, the completed gift of the joint tenancy to Mrs. Fischer having been established, the burden shifted to decedent's administrator to prove the gift back. He has not met this burden.

The hearing judge makes much of the fact that the disputed certificates were never in the physical possession of Mrs. Fischer. No note is made of the fact that neither were they ever in the physical possession of decedent. The facts are: Subsequent to the date of

decedent's gift of joint tenancy in the 50 shares of General Motors Corporation there were two stock dividends or splits which increased the number of shares from 50 to 300. The new shares carried the same registration as the old, namely, in the joint names of decedent and Mrs. Fischer as joint tenants with right of survivorship. There was an intervening step in the United States Steel Company stock. In November 1950, the 40 shares of Commonwealth Edison were sold for $1,073.47 and the 10 shares of duPont were sold for $1,243,80, and on February 1, 1951, 50 shares of United States Steel common were purchased with the proceeds of those sales, for there were only a few dollars difference, and registered in the joint names of Mrs. Fischer and decedent. Subsequently, a certificate covering a "two for one split" in 1955 was issued in the joint names. When these new certificates were issued as stock splits or bought with the proceeds of old stock and all were registered in the joint names of decedent and Mrs. Fischer, she acquired the same rights therein as in the old stock. This was an incident of ownership. No new gift was necessary.

In summary, decedent made a valid inter vivos gift of a joint ownership with right of survivorship in 50 shares of General Motors, 10 shares of duPont and 40 shares of Commonwealth Edison. The requisite intention to make a gift and delivery were present. These certificates, those later purchased with the proceeds of the sale thereof and the stock issued as stock splits were all registered in the names of Mrs. Fischer and decedent "as joint tenants with right of survivorship" and remained so registered for the 15 years from September 15, 1941, to June 28, 1956. Decedent intended that they "be the sole property of" Mrs. Fischer at his death. Mrs. Fischer never made a gift back to decedent of the joint tenancy. Hence, she is now the sole owner of these stocks.

If there was not a valid gift of a joint tenancy in the instant case, it would seem difficult, if not impossible, to consummate such a gift where the donor thereafter exercises any dominion, control or right in connection with the stock which was the subject of the gift. In any event, the donee of a joint tenancy in stock, no matter how clear the gift, will *at her peril* ever permit the stock certificate to leave her possession for even a single instant. In my opinion, this is not, and should not be, the law.

It is common practice, particularly among persons of modest means, to register securities as joint tenants with right of survivorship, and to deposit cash in joint accounts or in tentative trust accounts. Brokers and bankers attest to the large number of stocks and banking accounts held in joint tenancies with right of survivorship, tenancies by the entireties and tentative trusts. Frequently, most of the assets in modest estates are so held.

In the famous case of Matter of Totten, 179 N. Y. 112, 71 N. E. 748, the tentative trust was sustained as an expedient, rather than on technical, legalistic principles of trust law. Pennsylvania has consistently upheld the validity of tentative trusts. The text writers properly label them "a poor man's will". It would seem that *joint tenancies* with right of survivorship also constitute "a poor man's will". The laity believe this to be so. There would seem to be no reason to distinguish between the two. In fact the joint tenancy is stronger and more binding. The tentative trust is revocable by the creator alone at any time until his death. The beneficiary does not need to do anything; he does not even need to know of the tentative trust until after the creator's death. In contrast, the action of creating a joint tenancy is final. The stock certificate and the books of the issuing corporation carry the registration of the joint tenancy. The donor cannot obtain a return

of sole dominion and control of the stock certificate without the action of the other joint tenant or a court decree. At the very least the donee is a third party beneficiary of the contract between decedent and the corporation when he so registered the stock certificate, as were the United States bonds in Horstman Estate, 398 Pa. 506.

The majority opinion in the instant case raises impossible barriers to the making of a valid gift inter vivos of a joint tenancy with right of survivorship. It practically eliminates such gifts from the Pennsylvania law. Furthermore, it makes almost impossible the creation of any joint tenancy with right of survivorship except where there is an express written executed contract creating such joint tenancy.

It opens every stock, bond and other security registered in good faith in the names of two or more persons as joint tenants with right of survivorship to litigation by the personal representative and to inquiry by the tax authorities as to whether a valid gift inter vivos was made during the lifetime of the decedent. The Evidence Act of May 23, 1887, P. L. 158, sec. 5 (e), 28 PS §322, precludes the testimony of the survivors. Consequently, it is very difficult for the survivors to prove the essential facts. As a consequence injustice will frequently result, as in this case where a niece, who for 15 consecutive years was the registered joint owner of valuable stock, has it taken from her.

For all of the foregoing reasons, I would sustain Mrs. Fischer's exceptions as to the ownership of the disputed stock certificates and the dividends paid thereon after decedent's death.

Hence, I dissent.

It would appear from the record that during decedent's lifetime Mrs. Fischer never made claim upon Girard Trust Corn Exchange Bank or decedent for any portion of the cash dividends issued upon the dis-

puted stocks. This may have been because of an agreement between the parties that decedent should keep the dividends during his lifetime, or because she waived her rights. In any event, she has not met the heavy burden of proving against decedent's estate that she is now entitled to the dividends paid during his lifetime. Hence, I concur with the majority on this point.